FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff–Appellee,

v.

Mohamed Anwar M. HADID, Defendant–Appellant (Two Cases).

Nos. 90–1825, 90–1844.

United States Court of Appeals, Fourth Circuit.

Argued July 10, 1991.

Decided Oct. 23, 1991.

Mark Scott London, Washington, D.C., for defendant-appellant.

Robert Wilson Hawkins, Hunton & Williams, Washington, D.C., argued (Richard F. Gibbons, Jr., Hunton & Williams, Washington, D.C., on the brief), for plaintiff-appellee.

Before WILKINSON, WILKINS, and NIEMEYER, Circuit Judges.

## OPINION

NIEMEYER, Circuit Judge:

On a complaint filed by the National Bank of Washington (NBW) to collect on two promissory notes that Mohamed Anwar M. Hadid guaranteed, a jury found in favor of Hadid, crediting his testimony of an oral agreement by which his guarantees would become null and void if he were not given control of stock which secured the notes. On NBW's motion for judgment notwithstanding the verdict, the district court found that the oral agreement violated the parol evidence rule and entered judgment against Hadid in the amount of $1,854,875.03 on the notes plus $272,035.26 in attorneys' fees. The Federal Deposit Insurance Corporation (FDIC) succeeded to the judgment when it declared NBW insolvent in August 1990. Hadid contends on appeal that the facts surrounding application of the parol evidence rule were properly submitted to the jury and should have been left for the jury to determine. He also contends that under District of Columbia law, the attorneys' fees awarded should be those actually incurred, and not the 15% specified in the notes. As an additional ground for affirmance, the FDIC contends that, because of special rights given to it under federal law, an oral agreement cannot be enforced against it to deprive it of the benefit of the judgment to which it succeeded.

For the reasons that follow, we affirm the judgment of the district court on the notes but reverse with respect to the amount of the award for attorneys' fees.

### I

As evidence of the debt arising from two loans made by NBW to Keystone Financial Corporation (Keystone) and P.S. Investment Co., Inc. (P.S. Investment) in 1986, NBW accepted two promissory notes. The one signed by Keystone was in the amount of $1,314,209.75 and its repayment was secured by a pledge of the common stock in McDowell Enterprises, Inc. Repayment of that note was also guaranteed by Dr. P.S. Prasad and Bert Lance. The second, signed by P.S. Investment, was in the amount of $200,000.00, and its repayment was guaranteed by Dr. Prasad and his wife. Dr. Prasad owned both Keystone and P.S. Investment.

The loans, which were short-term, were extended by NBW on several occasions in 1986 and early 1987, but in August 1987 NBW demanded full repayment. At that time, Dr. Prasad proposed several arrangements for restructuring the loans, one of which provided that Hadid would become a new guarantor. Hadid was a well-known customer of NBW, whose creditworthiness was known to the bank. The bank therefore accepted the proposal. The agreed terms for the restructuring of the loans were set forth in two written Renewal and Extension Agreements dated November 30, 1987.

The Renewal and Extension Agreement for each loan is prefaced by introductory provisions which describe the history of the loan, the security, the guarantors and the request for restructuring. In addition to setting forth the terms of restructuring, each agreement refers to a new promissory note and guarantee to be executed simultaneously. Both agreements provide that District of Columbia law shall govern. The Renewal and Extension Agreement applicable to the Keystone loan contains an additional section that provides that the pledge agreement granting NBW a security inter-

est in the McDowell stock "shall remain in full force and effect." J.A. 221.

Despite the extensions granted by the Renewal and Extension Agreements, the loans were not paid by either the principals or guarantors and NBW filed suit to enforce the notes and guarantees. Hadid defended the claims against him by alleging that he should be released from his guarantees because NBW failed to release to him the McDowell stock that had been pledged to NBW. He alleged that an oral agreement was reached when the Renewal and Extension Agreements were negotiated, that he would be given control over the stock and, if not, his guarantee would be null and void. NBW disputed this claim. In addition to denying that any such agreement was ever made, NBW presented evidence that Hadid never asserted the existence of any oral agreement at any time after the Renewal and Extension Agreements were executed, including each occasion when demand on the notes was made and when thereafter he made payments of interest and gave assurances of repayment. Crediting Hadid's oral agreement, the jury returned a verdict in his favor.

Before the commencement of trial, NBW filed a motion *in limine* seeking a ruling that the parol evidence rule barred Hadid from introducing evidence at trial that NBW had orally agreed to release the stock to him. The district court took the matter under advisement so that it could receive evidence on the issue. When NBW renewed this defense in a motion for a directed verdict, the district court again deferred ruling, stating that it would let the case be presented to the jury and would take up the question "on a post-trial motion if the verdict is adverse to [NBW]." J.A. 164. When the jury returned a verdict in favor of Hadid, the district court granted NBW's motion for a judgment notwithstanding the verdict, finding: 1) that the Renewal and Extension Agreements were fully integrated agreements and 2) that the proffered oral agreement conflicted with the express terms of the written ones. Applying the parol evidence rule applicable in the District of Columbia, the district court rejected Hadid's defense based on the oral agreement as a matter of law and entered judgment in favor of NBW on the notes.

The district court also awarded NBW $272,035.26 for attorneys' fees, representing 15% of the amount collected, as provided for in the notes. It did so, despite the affidavit of NBW that the amount of attorneys' fees expended was actually $99,-861.07.

After judgment was entered in this case, the Controller of the Currency declared NBW insolvent, closed the bank and appointed the FDIC as receiver. On August 23, 1990, the district court substituted FDIC for NBW in this action.

## II

■ The parties agree that the law of the District of Columbia governs, as provided in the governing loan documents, and that the District of Columbia Court of Appeals decision in *Ozerol v. Howard University*, 545 A.2d 638 (D.C.App.1988), states the governing principles of the District of Columbia's substantive law on parol evidence. As stated in *Ozerol*, "[the parol evidence] rule provides that when parties to a contract have executed a completely integrated written agreement, it supersedes all other understandings between the parties. Thus, the writing itself is viewed as the expression of the parties' intent." 545 A.2d at 641 (citing Restatement (Second) of Contracts § 213 (1979)). Those principles, moreover, are not atypical. Professor Williston has more generally summarized the principle: " 'Where parties, without fraud or mistake, have reduced to writing a contract, it is presumed alone to express the final conclusion reached, and all previous and contemporaneous oral discussion, or written memoranda, are assumed to be either rejected or merged in it.' " 4 S. Williston, A Treatise on the Law of Contracts § 632A, at 984 (3d ed. 1961) (quoting *Goldenberg v. Taglino*, 218 Mass. 357, 105 N.E. 883 (1914)). Williston goes on to point out that when the writing is complete on its face and is certain and definite as to the objects of the agreement, the writing is "conclusively presumed" to

be the entire contract between the parties, which cannot be contradicted or modified by parol or extrinsic evidence. *Id.* at 985.

Whether an agreement is integrated is a factual question that "depends on the intent of the parties [as revealed by the writing itself], the conduct and language of the parties, and the surrounding circumstances." *Ozerol,* 545 A.2d at 641. The application of the parol evidence rule, however, is a question for resolution by the court, not the jury, and, as is the case with any question for the court, it is the court and not the jury which resolves disputed facts on the point. *See id.* at 643 ("question of integration ... is for the trial court to determine as 'a question of fact....'") (quoting Restatement (Second) of Contracts § 209 cmt. c (1979)). If, after resolving disputed facts, the court finds that the transaction is intended to be covered by the writing, only the writing is considered by the jury in resolving liability. The court does not, and need not, decide that the oral agreement was not made. Rather, it decides only that the oral agreement is irrelevant to liability on the writing. Similarly, if the court concludes that the writing is not integrated, it does not decide that the oral agreement was made. It commits that issue to the jury. *Id.* at 642.

■ While the preferred practice under District of Columbia law is to make and resolve any objection on parol evidence preliminarily, it nevertheless permits the issue to be raised for the first time on a motion for directed verdict, since the rule is a matter of substantive law and not merely a rule of evidence. *Ozerol,* 545 A.2d at 642. In any event, when the trial court resolves the factual question of whether the written agreement is integrated, our standard of review, as a matter of federal law, is whether the findings are clearly erroneous. *Cf. Ozerol,* 545 A.2d at 643.

■ In this case we cannot, and do not, conclude that the trial court's findings are clearly erroneous. The court found first, on the basis of all the evidence presented at trial, that the Renewal and Extension Agreements dated November 30, 1987, were fully integrated agreements. All prior understandings between the parties, including the promissory notes, the pledge agreements, and the guarantees, were reduced to formal written agreements, and no evidence suggests that any understanding prior to the Renewal and Extension Agreements was governed by oral agreements. As sophisticated businessmen, the parties not only documented their understandings on virtually all points, they retained attorneys to draft documents and have them executed formally, with witnessing and, in the case of corporations, attestation. Particularly in light of the fact that one of the formal agreements between the parties specifically addressed the continuation of the McDowell stock-pledge agreement, one would expect that other agreements reached at the time of negotiations regarding the role of the McDowell stock would also have been reduced to writing if the parties intended them to be legally binding. A different analysis would make written instruments of little value and increase the temptation to commit perjury or simply to restate agreements to the liking of the parties.

The district court also determined that even if the agreements were not fully integrated, the oral agreement proffered by Hadid conflicted with the terms of the written Renewal and Extension Agreement for the Keystone loan. Hadid testified that an oral agreement, reached at the time he signed the Renewal and Extension Agreements, provided that he would receive "control over the McDowell stock" so that he could "sell it" if necessary, and if he did not receive control over the McDowell stock, the guarantees were null and void. The purported oral agreement to give Hadid "control over the McDowell stock" is directly inconsistent with the express language of the Renewal and Extension Agreement for the Keystone loan providing that the pledge agreement involving the McDowell stock in favor of NBW "shall remain in full force and effect." To continue the perfection of the pledge agreement and NBW's security interest in the stock, NBW would have to retain possession of the stock. *See* 28 D.C.Code Ann. § 9–

304(1) (1991) (D.C.'s version of the Uniform Commercial Code). Any control by Hadid, therefore, would have conflicted with NBW's security interest as preserved by the written instruments.

### III

■ The FDIC argues additionally that evidence of an oral agreement between Hadid and NBW cannot be advanced to deprive the FDIC of special rights that it enjoys under both federal common law and federal statute. Under *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and 12 U.S.C. § 1823(e) (1988), agreements between a bank and a borrower must be written and in the bank's official records to be enforceable against the FDIC. The purpose of the doctrine and the statute which codifies it is to permit the FDIC to rely on bank records and to protect the FDIC from secret agreements. While Hadid takes no issue with the general principle, he argues that the defense cannot be raised by the FDIC for the first time on appeal, relying on *Thurman v. FDIC*, 889 F.2d 1441 (5th Cir.1989); *Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n*, 885 F.2d 266 (5th Cir.1989); and *Grubb v. FDIC*, 868 F.2d 1151 (10th Cir. 1989). The FDIC relies principally on *FDIC v. Castle*, 781 F.2d 1101 (5th Cir. 1986), which did permit the FDIC to raise the defense for the first time on appeal.

The rationales of the cases cited by the parties are consistent in concluding that the purposes of § 1823(e) are not frustrated by denying the FDIC the benefit of raising the defense when a judgment of record, after full litigation, provides that promissory notes are void because of oral arrangements. *Cf. Olney*, 885 F.2d at 275 (policies of *D'Oench* not impaired by denying defense after judgment, since collusion would be unlikely where parties heatedly litigated). When the FDIC takes over a bank after litigation and judgment, the documentation provided by the case record serves as notice to the FDIC of the status of the loan. In each of the three cases relied on by Hadid, the FDIC (or the FSLIC) was denied the defense in these circumstances. *See Thurman*, 889 F.2d at 1443; *Olney*, 885 F.2d at 274–75; *Grubb*, 868 F.2d at 1159. In this case, however, the FDIC succeeded to a judgment *in favor* of the bank which Hadid seeks to set aside based on an oral agreement. The policy behind *D'Oench* would be frustrated if the FDIC could not now defend against an attack made to overturn a judgment favorable to the bank based on an oral understanding. Accordingly, we hold that the *D'Oench* defense may be raised for the first time on appeal in circumstances where the FDIC succeeds to the bank's interest in a judgment in the bank's favor which the promisor seeks to avoid based on an oral understanding.

### IV

■ In awarding attorneys' fees of $272,035.26, the district court relied on the express language of the notes which provides that NBW is entitled to 15% of the unpaid balance if suit is "instituted to collect this note." J.A. 209, 215. Relying on *Columbia Plaza Corp. v. Security Nat'l Bank*, 676 F.2d 780 (D.C.Cir.1982), the court concluded that the amount is a contractual one reached after arm's length bargaining and therefore should be enforced.

Hadid contends that the amount of the fees is unreasonable and observes that the affidavit of NBW, submitted to the district court, demonstrates that the actual fees incurred amounted to only $99,861.07. He contends that under District of Columbia law, contractual provisions, such as presented in this case, are sustained "only as an indemnity for the reasonable fees necessarily and properly paid or incurred." *United States v. Reed*, 31 A.2d 673, 675 (D.C.App.1942). *Columbia Plaza*'s full enforcement of a contractual percentage fee provision, Hadid argues, is distinguishable on its facts and *Reed* has been reaffirmed subsequently. *See Nolan v. Nolan*, 568 A.2d 479, 490 (D.C.App.1990) (applying *Reed* to a marital separation agreement); *Central Fidelity Bank v. McLellan*, 563 A.2d 358, 360 n. 6 (D.C.App.1989) (applying

**1158**

*Reed* to an automobile installment loan contract). We agree with Hadid's analysis.

In *Columbia Plaza,* the appellate court upheld the trial court's award of fees based on the agreed-upon contractual provision rather than the actual amount incurred. 676 F.2d at 790–91. *Columbia Plaza,* however, did not reject *Reed;* rather it cited *Reed* for the general proposition relied upon by Hadid but then deviated from it because, before trial, appellants stipulated " 'attorney fees under the terms of the note' " and "did not [during trial] challenge the reasonableness of the attorneys' fees provision." 676 F.2d at 791 (quoting from the record). In this case, Hadid did challenge the amount of the award and NBW's counsel submitted an affidavit which stated that the total amount incurred was $99,-861.07. In these circumstances, the contractual provision should be enforced to the extent of actual fees incurred, not to exceed the 15% provided for contractually.

Our holding should not be misconstrued to conclude that a 15% fee is *per se* unreasonable. On the contrary, in the absence of a challenge to the fees' reasonableness, in which the actual fees are proved, the contractual provision would be enforced, much as a liquidated damage provision would be. When, however, as here, the reasonableness of the fees is challenged before the trial court and the proved actual fees amount to $99,861, an award of $272,-035 in accordance with a 15% contractual provision amounts to a windfall, or even a penalty, that the District of Columbia courts will not permit. As the court noted in *Reed:*

> To guard against possible oppression and injustice this rule [enforcing a percentage attorneys' fees provision only to the extent of reasonable fees necessarily and properly incurred] must apply, although defendant defaults; for this is but a reasonable exercise of the power of a trial court to prevent allowance of excessive fees.

31 A.2d at 676.

Because additional fees will have been incurred as a result of this appeal, we remand the case to the district court to award reasonable attorneys' fees, not to exceed the contractual limit of 15%. The judgment of the district court is otherwise affirmed.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.